1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF ARKANSAS
 2                         CENTRAL DIVISION

 3

 4   UNITED STATES OF AMERICA,      .
                                    . Case No. 4:20-MJ-00240-JJV-1
 5   PLAINTIFF,                     .
                                    . Little Rock, Arkansas
 6   VS.                            . November 4, 2020
                                    . 4:26 P.M.
 7   SKYLAR DAYNE GOODMAN,          .
                                    . Other case number:
 8   DEFENDANT.                     . 3:20-CR-141
     . . . . . . . . . . . . . . . . District of North Dakota
 9

10

11                          TRANSCRIPT OF

12                        DETENTION HEARING

13             BEFORE THE HONORABLE JOE J. VOLPE

14              UNITED STATES MAGISTRATE JUDGE

15

16

17

18   ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Lorna Jones

19

20   Transcription Service:            Robin Warbritton
                                       Post Office Box 262
21                                     Vilonia, AR  72173

22

23

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

2

```
 1    APPEARANCES:

 2    For the Government:        Ms. Jana K. Harris
                                 U.S. Attorney's Office
 3                               Eastern District of Arkansas
                                 Post Office Box 1229
 4                               Little Rock, AR  72203-1229

 5    For the Defendant:         Ms. Sonia Fonticiella
                                 Federal Public Defenders Office
 6                               The Victory Building
                                 1401 West Capitol Avenue
 7                               Suite 490
                                 Little Rock, AR  72201
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

I N D E X

| | DIRECT | CROSS | REDIRECT | RECROSS | BY THE COURT |
|---|---|---|---|---|---|
| GOVERNMENT'S WITNESSES: | | | | | |
| Bryce Geiggar | 11 | 16 | 19 | | |
| Eric Hellekson | 20 | 30 | | | 32 |
| (Further Cross Exam) | | 41 | | | |
| DEFENDANT'S WITNESS: | | | | | |
| Shirley Goodman | 43 | 47 | | | 51 |

| EXHIBITS: | IDENTIFIED | RECEIVED |
|---|---|---|
| Government's Exhibit No. 1 | 13 | 15 |

4

P R O C E E D I N G S

1  (Call to order of the Court.)

2          THE COURT:  All right.  We are on the record in the

3  matter of *United States of America v. Skylar Dayne Goodman*,

4  case 4:20-MJ-240 and case 3:20-CR-141.

5          We're here for a hearing pursuant to the Bail Reform

6  Act.

7          Mr. Goodman, can you hear me okay?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Do you agree to proceed by video today?

10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  And I know in the courtroom we have your

12 attorney, Ms. Fonticiella, and for the United States, Ms. Jana

13 Harris, and also for the Pretrial Office, Officer Geiggar.

14         And are you all ready to proceed?  I don't perceive

15 this is a presumption matter, is it?

16         MS. HARRIS:  No.

17         THE COURT:  Okay.  And then, you know, we were trying

18 to evaluate kind of the posture of this thing, because you

19 have a warrant on a revocation and then you have a warrant on

20 a superceding indictment, correct?  Am I correct on both of

21 that?

22         MS. HARRIS:  (No audible response.)

23         THE COURT:  So, it appears to me that the -- my role

24 would be on the superceding indictment, even though, like I

1    say, there was a -- a warrant issued on the revocation, but

2    it's kind of part and parcel.

3            So, what my view is, is he would go back to North

4    Dakota either in custody or not in custody and face the

5    revocation issue.  But, for today, it's whether or not he goes

6    back to custody, to face arraignment either in custody or out

7    of custody.  So, it's just basically a straight up Bail Reform

8    Act determination.

9            Do you all agree with me on that?

10           MS. HARRIS:  Yes, Your Honor, well --

11           THE COURT:  So, I guess really what I'm saying is I

12   don't know that I'm -- I don't know that I need to take up the

13   issue of whether he violated his bond.  I mean, that's between

14   him and Judge Senechal up in North Dakota.

15           I think it's just a straight up he's been indicted,

16   there's a warrant on the superceding indictment, and whether

17   or not he should be released to go back there to be arraigned

18   or whether he should remain in custody and be transported

19   there.

20           Is that a fair assessment?

21           MS. HARRIS:  Your Honor, from the United States --

22   United States' standpoint it is, but we would also be arguing

23   the violation as a part of why he should be detained.

24           THE COURT:  Understand.

25           MS. HARRIS:  Okay.

1          THE COURT:  What is your assessment, Ms. Fonticiella?

2          MS. FONTICIELLA:  Your Honor, I -- my understanding

3   is we're here for both, and that this Court could -- would

4   have authority to make a determination on the revocation since

5   he is supervised out of this district, but -- but I understand

6   -- (feedback on the recording) -- I don't know why this is --

7          THE COURT:  Yeah, it's Judge Senechal's order, so I

8   think he has to deal with her on that.  Even though we had

9   that in, what, Mr. Ivory's case --

10          MS. FONTICIELLA:  Uh-huh.

11          THE COURT:  -- which I think you represent Mr. Ivory

12   on, a little different because that was our case here, the

13   case was out of Arkansas.  There, the case is out of -- here,

14   the case is out of North Dakota.  So, I mean, I don't know

15   that it really matters that much.  It's still the same

16   analysis on whether he's a risk of flight or a danger to the

17   community or both and whether or not I could fashion a

18   combination of conditions or conditions to get him back to

19   North Dakota, in my opinion, to face two things, face the

20   revocation issue and face the arraignment.  That's what he

21   needs to -- eventually, he's got to go back to North Dakota,

22   because I'm also looking at it if I'm -- two courses of

23   action, if I release him, then he's got to go deal with the

24   revocation matter in North Dakota, and then be arraigned.  If

25   I detain him, then -- on the revocation, I don't know that

1  Judge Senechal really -- I mean, then it's between him and the

2  District Judge, I guess, on arraignment, what the District

3  Judge would want to do if I detain him on the arraignment.

4  And then, it almost makes the revocation irrelevant.

5         So, I don't know that it really matters that much.

6  You're welcome to present whatever evidence you want to

7  present and I'll consider it, but I'm just going to basically

8  consider it as a straight as if he was indicted and -- you

9  know, in this district, and whether or not he should be

10  detained or released.

11         MS. HARRIS:  Okay.  And then he'll face his

12  revocation hearing once he gets back to North Dakota either by

13  way of the Marshals Service or on his own steam?

14         THE COURT:  Right.  But, like I say, in my opinion,

15  legally -- and that's for them to work out -- but if I detain

16  him, and he goes back up there, then I don't think -- you

17  know, I think Judge Senechal can either, you know, revoke him

18  or not, but it has no impact, because, you know, as we know,

19  if I detain him here on this, and, you know, I guess he needs

20  to know this, that this is going to be his bond hearing.  And

21  I understand why you want to proceed here, but if he goes up

22  there, only the District Judge then -- if I detain him, only

23  the District Judge could release him.

24         MS. HARRIS:  Yeah.  We -- we understand that, Your

25  Honor.

8

1          THE COURT:  Okay.  All right.

2          You may proceed, Ms. Harris.

3          MS. HARRIS:  Okay.  Your Honor, for purposes of the

4   hearing, would the Court consider the Pretrial Services

5   Report?

6          THE COURT:  So, I've been given several things in the

7   file, there is a Pretrial Services Report, and I'm looking at

8   -- the date is September 14th, 2020; is that the one you want

9   to go off of?  It's in the last page.

10         MS. HARRIS:  Oh.

11         THE COURT:  It says 9/14, prepared by Megan Nelson.

12         MS. HARRIS:  Yes, Your Honor.

13         THE COURT:  Okay.

14         MS. HARRIS:  Yes, Your Honor.

15         THE COURT:  Is there any reason to not make that a

16   part of the record, Ms. Fonticiella?

17         MS. FONTICIELLA:  Your Honor, no, I mean, I think we

18   can use it like we do.

19         THE COURT:  All right.  It will be admitted.

20         MS. HARRIS:  And then, Your Honor, just so the order

21   setting conditions of release in North Dakota, to make that a

22   part of the record.  I believe that's one of the documents

23   that Probation had sent.

24         THE COURT:  Okay.  And I have seen that.  I mean,

25   that's part of the record because it's part of the docket, but

1  any reason why I can't consider that?

2        MS. FONTICIELLA:  No objection, Your Honor.

3        THE COURT:  All right.

4        MS. HARRIS:  And, Your Honor, the only other thing I

5  would ask to make a part of the record, and I don't believe

6  the Court has this, there is a -- there is a pending charge

7  against the defendant out of North Dakota.  I believe the

8  arrest date was on June 27th, 2020.  And the Probation Officer

9  had obtained a portion of a -- a police report from that.  We

10 do not have a law enforcement officer to call.  We would just

11 call Officer Geiggar to testify that he received this from the

12 Probation Office in North Dakota.

13        THE COURT:  Is this -- it's case 9-2020-CR-026898

14 (sic)?

15        MS. HARRIS:  Yes, Your Honor.

16        THE COURT:  Or 2689.

17        MS. HARRIS:  Well, 2689.  Yes, Your Honor.

18        THE COURT:  Yeah.  Any objection to that being made

19 part of the record?

20        MS. FONTICIELLA:  Yes, Your Honor.  I'd object on a

21 couple of bases, and I understand -- I always preface this

22 with I understand the Rules of Evidence don't apply in bond

23 hearings, but this is not a complete document.  There is no

24 agent to testify about it.  And it's -- it's so unreliable and

25 overly prejudicial based on the way that it's been obtained

1  and being presented to the Court, and based on the amount of

2  hearsay that's in here, the -- I think it's -- it's overly

3  prejudicial and incomplete and should not be received in

4  evidence for those reasons.

5          THE COURT:  Response?

6          MS. HARRIS:  And, Your Honor, we would submit this is

7  what Probation in North Dakota sent to Probation here, sent to

8  Officer Geiggar.  And we would submit that any weight to be

9  given to it -- or I guess the question -- it wouldn't be a

10 question of admissibility, it would be a question of weight.

11 Obviously, we don't have the officer who took the report.  We

12 would just have Officer Geiggar who received this report.  And

13 I don't know that his receipt of it would be an issue.  And I

14 would just ask the Court to consider it and give it what

15 weight the Court deem necessary.

16         And does the Court have a copy of it?

17         THE COURT:  I do.

18         MS. HARRIS:  Okay.

19         THE COURT:  Well, I think -- I think you need to --

20 let's lay a foundation, at a minimum, if -- if there's an

21 objection, because I don't -- I mean, I'm looking at it and

22 I'm curious how it got to my bench here, and so I think we

23 probably need to understand a little bit about where it's

24 coming from and how it was received and all that stuff.  So

25 why don't you put Officer Geiggar on the stand, and then I'll

1    let Ms. Fonticiella cross examine him.

2            So, for right now, I'll hear from him first and then

3    I'll decide what to do with it.

4            MS. HARRIS:  Okay.  Thank you, Your Honor.

5        (BRYCE GEIGGAR, GOVERNMENT'S WITNESS, SWORN.)

6            THE COURT:  And you're free to take your mask off if

7    you want.  You can keep it on or take it off.  It's up to you.

8            MR. GEIGGAR:  Yes, Your Honor.

9                         DIRECT EXAMINATION

10   BY MS. HARRIS:

11   Q    Would you state your name for us, please, and where you're

12   employed?

13   A    Bryce Geiggar, United States Probation Office.

14   Q    Okay.  And are you supervising the defendant in the

15   Eastern District of Arkansas?

16   A    I am.

17   Q    And when did you begin supervision of him?

18   A    I believe it was October the 12th.

19   Q    And he is currently charged in the District of North

20   Dakota; is that correct?

21   A    That is correct.

22   Q    Okay.  And you received the Pretrial Services Report from

23   the District of North Dakota?

24   A    That is correct.

25   Q    And one of the pending charges that is listed in there is

1  for a date of arrest on June 27th, 2020 for two counts; one,

2  for terrorizing with a dangerous weapon; and then, count two,

3  for domestic violence with assault/bodily injury.  And in

4  connection with that particular offense, did you contact the

5  Probation Officer -- his supervising Probation Officer in

6  North Dakota?

7  A   I did.

8  Q   And did you request a copy of the underlying police report

9  for this incident?

10  A   Yes, I requested a copy of a police or incident report

11  relating to that incident.

12          MS. HARRIS:  And, Your Honor, may I approach?

13          THE COURT:  Yes.

14  BY MS. HARRIS:

15  Q   I'm going to show you what we're going to mark as Exhibit

16  1 for your testimony.  And there are two pages to that.

17  A   Okay.

18  Q   And can you tell us what this is, please?

19  A   This is the report that was provided by the supervising

20  officer in the District of North Dakota pertaining to the June

21  27th, 2020 arrest of the defendant.

22  Q   Okay.  And, indeed, the first page of the report of

23  Officer Annie Brewer is dated June 27th, 2020; is that

24  correct?

25  A   That is correct.

1  Q    And the report begins that she was working on Saturday,

2  June 27th, 2020?

3  A    That is correct.

4  Q    And then, the case number that appears in the Pretrial

5  Services Report, does that also match the case number that

6  appears on this two page report?

7  A    It does.

8  Q    And this is the report that was sent in response to your

9  request?

10 A    That is correct.

11 Q    And that you provided to the parties?

12 A    That is correct.

13         MS. HARRIS:  Your Honor, at this time, I would move

14 for introduction of Government's Exhibit No. 1.

15     (Government's Exhibit No. 1 identified.)

16         THE COURT:  Well, do you have --

17         MS. FONTICIELLA:  Your Honor?

18         THE COURT:  -- do you want to ask?

19         MS. FONTICIELLA:  Same objection, Your Honor.

20 There's -- this document is not signed.  It's not complete.

21 And, you know, I know I always get shot down on my hearsay

22 objections in bond hearings, but I make them anyways.  It's

23 extreme hearsay at this point, especially without even having

24 a complete document.  So, I understand that the numbers may

25 match up, but I -- I think this is -- there needs to be some

1  -- some level of reliability, and I have no doubt that Mr.

2  Geiggar is testifying truthfully, but if the document is not

3  complete, then he can't tell this Court that it's an accurate

4  document.

5          MS. HARRIS:  But, Your Honor, I would submit that

6  when you read the -- the document itself, it does start with

7  the beginning of the incident, and then ends with the officer

8  providing the domestic violence worksheet and danger

9  assessment, going over that with the victim.  So, it tells the

10  victim's story.

11          THE COURT:  Let me ask -- let me ask the officer.

12  Officer Geiggar, so you -- you requested this information?

13          MR. GEIGGAR:  I did, Your Honor.

14          THE COURT:  And was that just as initially

15  supervising him, or was this a part of this hearing?

16          MR. GEIGGAR:  In preparation of this hearing, Your

17  Honor.

18          THE COURT:  And what was the -- why did you ask for

19  this?

20          MR. GEIGGAR:  In preparation of the hearing, I spoke

21  with Ms. Harris and she requested that I contact that office

22  and obtain a copy of this report.

23          THE COURT:  Okay.  And, so, did you talk to the

24  officer out there, the Probation Officer out there?

25          MR. GEIGGAR:  I -- I talked with the officer via

1  telephone and I received the reports via the Internet.

2          THE COURT:  Okay.  The e-mail?

3          MR. GEIGGAR:  Yeah, I'm sorry, e-mail, Your Honor.

4          THE COURT:  Did you ever ask why -- it looks like the

5  report is incomplete, did you ask if there was any more of the

6  report or anything?

7          MR. GEIGGAR:  Your Honor, my understanding, when I

8  asked for the report, she stated that she was forwarding all

9  that she had pertaining to this particular case.

10          THE COURT:  And the -- the information as well, the

11  charge information, did you ask for that as well?

12          MR. GEIGGAR:  Yes, Your Honor.  I asked for all

13  information pertaining to today's hearing.

14          THE COURT:  All right.  Yeah, I -- I mean, I think it

15  goes to weight versus admissibility in this hearing, based on

16  the rules of not having a rule.  So, you make some good

17  points.  I'll let you argue also.  But I'm going to receive it

18  and it can be a part of the evidence.

19      (Government's Exhibit No. 1 received.)

20          MS. FONTICIELLA:  May I -- may I make one more

21  objection, just to make a record, Your Honor?

22          THE COURT:  You may.

23          MS. FONTICIELLA:  Mr. Geiggar just testified that he

24  asked for the -- all the documents related to that incident,

25  and that that is what that officer in North Dakota said that

1    he provided -- or she provided, but their -- even their

2    complete copy is incomplete then.  So, I -- I would like that

3    to be just real clear on the record as far as weight goes.

4            THE COURT:  I understand.  Well, and I think, you

5    know, the better argument is that the only reason Officer

6    Geiggar has it is because Ms. Harris asked him to get it.

7            MS. FONTICIELLA:  Yes.

8            THE COURT:  So, I don't know that that's --

9            MS. FONTICIELLA:  I didn't -- I didn't want to be --

10           MS. HARRIS:  Well, but I would -- I would submit that

11   that doesn't make it inherently unreliable.  It's just going

12   on a report instead of just the officer's reading it, so.

13           THE COURT:  I agree.  And like I say, I -- I think

14   it's clearly admissible.  And, you know, the -- whether or not

15   it's reliable, given the fact that it is incomplete, is

16   something for me to consider.  So, I'll do so.

17           MS. HARRIS:  Thank you.

18           THE COURT:  All right.  Anything else of this

19   witness?

20           MS. HARRIS:  No, Your Honor.

21           THE COURT:  Do you have anything of this witness?

22           MS. FONTICIELLA:  I do.

23                           CROSS EXAMINATION

24   BY MS. FONTICIELLA:

25   Q    I know you've only --

Geiggar - Cross                                    17

1          MS. FONTICIELLA:  Well, may I proceed, Your Honor?

2          THE COURT:  Please.  Because I was going to ask the

3    same question.

4          MS. FONTICIELLA:  Okay.

5    BY MS. FONTICIELLA:

6    Q    Officer, I know you've only had him since, what did you

7    say, October 12th, right?

8    A    October 12th.  That is correct.

9    Q    Okay.  And he -- he has been staying in Arkansas since

10   that time with his mother, correct?

11   A    That is correct.

12   Q    Have you been in regular contact with him?

13   A    I spoke with the defendant on October the 12th.  We've

14   talked via telephone on two other occasions.  And we talked

15   prior to him being taken into custody on yesterday's date.

16   Q    Okay.  And he did come into the courthouse to meet with

17   you that day when you asked him to, correct?

18   A    That is correct.

19   Q    Okay.  And he didn't know -- oh, he was trying to comply

20   with all the conditions and everything at that point -- with

21   your instructions, I should say?

22   A    That is -- he -- he reported as directed on that date.

23   Q    Okay.  Had he complied with any other requests or, you

24   know, requirements as far as you're concerned with in -- in

25   your interactions with him?

1  A   Mr. Goodman reported to the Probation Office as

2  instructed, I believe it was on October the 13th, for

3  completion of his intake.  And he reported as directed on

4  yesterday's date for a meeting with myself and a drug screen.

5  Q   Okay.  Have you done a home visit or anything like that?

6  And I understand that COVID has kind of made that more

7  difficult, but.

8  A   I did a virtual residence verification prior to Mr.

9  Goodwin (sic) -- Mr. Goodman's arrival in Arkansas.

10 Q   And did you find that his -- his home was suitable and

11 everything was in order?

12 A   That is correct.

13 Q   Okay.  And there's no evidence to suggest that's changed

14 since yesterday, correct?

15 A   That is correct.

16 Q   Are you aware of any job applications or any of his

17 efforts in trying to maintain employment -- gain employment,

18 maintain it, and/or go to school?

19 A   Mr. Goodman informed me last week that he was in the

20 process of obtaining employment.  When I followed up with him

21 on Monday, he then told me that that job opportunity fell

22 through and he was actively searching for employment again.

23 Q   Okay.  And the -- you're familiar with the PS-8, right?

24 A   Yes, I am.

25 Q   Okay.  And the allegation is that he had tampered with

1  witnesses, correct?

2  A    Yes, it's alleged that he violated conditions number 1 and

3  conditions number 9.

4  Q    Okay.  And all of those alleged witnesses are in North

5  Dakota, correct?

6  A    I'm unaware of where the witnesses are located.

7  Q    Okay.  But you -- but you know Mr. Goodman is here and

8  will -- and intends to stay here, correct?

9  A    Mr. Goodman is approved to reside with his parents per the

10  court order, and his parents are residing here in Arkansas.

11          MS. FONTICIELLA:  Okay.  Nothing further, Your Honor.

12          THE COURT:  Anything from the United States?

13                       REDIRECT EXAMINATION

14  BY MS. HARRIS:

15  Q    When you told him to report, did you let him know that

16  there was an outstanding arrest warrant for him?

17  A    I did not.

18  Q    Okay.

19          MS. HARRIS:  That's all I have, Your Honor.

20          THE COURT:  All right.  Officer, you may stand down.

21  Thank you.

22      (Witness steps down.)

23          THE COURT:  You may call your next witness.

24          MS. HARRIS:  Your Honor, we would call Special Agent

25  Eric Hellekson.

Hellekson - Direct                    20

1          THE COURT:  All right.  Dialing him up by phone, I

2   guess.  Okay.  FBI Agent?

3          MS. HARRIS:  Yes, Your Honor.  He's out of Fargo,

4   North Dakota.

5          MR. HELLEKSON:  Hello.

6          THE COURT:  Is this Agent Hellekson?

7          MR. HELLEKSON:  Yes.

8          THE COURT:  This is Joe Volpe.  I'm a U.S. Magistrate

9   Judge in the Eastern District of Arkansas.  I'm going to put

10  you under oath.  And then the United States will ask you

11  questions, and then the defense will cross examine you.  Okay?

12         MR. HELLEKSON:  Okay.

13         THE COURT:  Do you swear to tell the truth, the whole

14  truth, and nothing but the truth, so help you God?

15         MR. HELLEKSON:  I do.

16     (ERIC HELLEKSON, GOVERNMENT'S WITNESS, SWORN.)

17         THE COURT:  All right.  Ms. Harris, you may ask.

18                    DIRECT EXAMINATION

19  BY MS. HARRIS:

20  Q   Could you state your name for the record, please, and tell

21  us -- and tell us where you're employed?

22  A   My name is Eric Lee Hellekson.  I'm employed with the FBI

23  as a Special Agent.

24  Q   And you're in the District of North Dakota?

25  A   Yes.

Hellekson - Direct                                    21

1   Q   Okay.  And how long have you been with the FBI?

2   A   I've been with the FBI for just over 17 years, since

3   August 2003.

4   Q   And are you familiar with the facts concerning the pending

5   federal charges against Skylar Goodman?

6   A   Yes.  I'm having some difficult time hearing you.

7           THE COURT:  Try to pull the --

8           MS. HARRIS:  Okay.

9           THE COURT:  -- mic a little more directly in front of

10  you, like --

11  BY MS. HARRIS:

12  Q   Agent -- okay -- can you hear me better now?

13  A   Yes, I can.

14  Q   Okay.

15          THE COURT:  So you have it -- you have it at a angle.

16  It's got to be straight forward.  There you go.

17  BY MS. HARRIS:

18  Q   And if it gets to where you can't hear me, because I turn

19  my head, just let me know.  Okay?

20  A   Okay.

21  Q   Okay.  So the charges that the defendant is facing is out

22  of the District of North Dakota?

23  A   Yes.

24  Q   Okay.  And he was initially indicted in May of 2020 in a

25  one count indictment charging him with attempting to wreck,

1  derail, and disable a train?

2  A    Yes.

3  Q    And that was for conduct that occurred on May 7th, 2020?

4  A    Yes.

5  Q    Can you give us just a brief summary of what happened on

6  May 7th, 2020; what happened with the train that day?

7  A    Sorry.  So, on May 7th, at approximately 9:55 p.m.,

8  approximately one mile west of Casselton, North Dakota, on the

9  double main line rail, which runs parallel to Interstate 94, a

10  freight train, Burlington Northern Santa Fe freight train

11  engineer, reported a rough rail at a crossing, which occurred

12  at 154th Avenue Southeast.  And the train experienced a jump

13  in the track at that crossing.  The engineer reported it

14  immediately to a track inspector, and within an hour the track

15  inspector responded to the area of the crossing and observed

16  pieces of rerailer laying near the crossing and the crossing

17  was damaged.

18  Q    Okay.  And you said that there were pieces of a rerailer?

19  Is that --

20  A    Yes, that's correct.

21  Q    Okay.  Can you tell the Court what a rerailer is?

22  A    Yes.  It's a piece of rail equipment used to place rail

23  cars back onto a track after a derailment.  The rerailer is

24  approximately three feet long by two feet wide, and it's made

25  of steel, and weighs anywhere from a hundred to 120 pounds.

1   Q   Okay.  And did the inspector go back the next day during

2   the daytime?

3   A   Yes, he did.

4   Q   Or he.  Sorry.  And can you tell the Court about the color

5   of the rerailer?

6   A   Yes.  The rerailers are supposed to be yellow so it's high

7   visibility so that one is not left behind at the job site and

8   engineers can spot it.  These -- this rerailer, the parts were

9   spray painted black, like rattle can black colored, instead of

10  yellow.

11  Q   And what steps did the investigator take next at that --

12  at the scene?

13  A   So, the track inspector contacted Burlington Northern

14  Santa Fe police officer Kerri Gortmaker, who responded on the

15  8th.  She took photographs of the damage to the rail and the

16  pieces of the rerailer.  One piece was actually still wedged

17  into the crossing between the track and the concrete.  And

18  then she collected what she could of the rerailer.

19  Q   Okay.  And was a camera also set up at that location?

20  A   Yes.  She actually set up two cameras.  One was a game

21  camera that she set up on a crossbuck at the crossing.  The

22  second camera was a video camera.  One of the cameras was

23  linked to her cell phone to alert her if any photos had been

24  taken or if there was activity.

25  Q   Okay.  And then was she alerted that there was activity

Hellekson - Direct                                    24

1  that took place on May 11th, 2020?

2  A   Yes.  On May -- on May 11th, she got a message that one of

3  the cameras had activity on it.

4  Q   And then what did it capture; what did the camera capture?

5  A   So, she responded out the next day and downloaded the

6  cards, and saw video and still photos of two males dressed in

7  hoodies, hooded sweatshirts with the hoods up, walking around

8  the railroad crossing with flashlights.  The camera also

9  captured the vehicle the two had come from, and it appeared to

10 be a Ford Explorer, police car looking Ford Explorer.

11 Q   Okay.  Did the video or the still photographs also capture

12 the license plate number of that vehicle?

13 A   Yes, it did.

14 Q   And who did -- who did that return to; who did the license

15 plate return to?

16 A   It was registered to Skylar Goodman.

17 Q   And then, did the investigation also determine that, at

18 that time, the defendant had worked for a company that was

19 contracted by the railroad to do this -- to rerail trains?

20 A   Yes.  Skylar Goodman was employed with RJ Corman, who

21 rerails -- contracts to rerail trains for Burlington Northern

22 Santa Fe.

23 Q   And, so, was the defendant and another individual, a

24 juvenile, identified as the two individuals who were there on

25 May 11th?

1  A    Yes.  Skylar Goodman was identified as one of the subjects

2  and -- was later identified as one of the subjects, and a

3  juvenile also was later identified.

4  Q    Okay.  And that -- and then, at some point, was he

5  interviewed and did he admit that that was -- that he was in

6  that video with the juvenile on May 11th at that crossing?

7  A    Yes, he did.

8  Q    And did he say that he and the juvenile had put a beam on

9  the track?

10  A    Yes.

11  Q    And that he knew that trains passed there on a regular

12  basis?

13  A    Yes.

14  Q    Okay.  And then, why had they returned there on May 11th;

15  why did he say that they returned there?

16  A    He said that he was really worried about -- that he was

17  worried about damage to the crossing and to pick up the pieces

18  of rerailer is why they returned.

19  Q    Okay.  And it's my understanding that he was interviewed

20  on another occasion, and in the later interview he denied

21  helping to place any things on the railroad tracks and blamed

22  the juvenile for it?  Is that --

23  A    Yes, that's correct.

24  Q    And then, after he was indicted on count one, the violence

25  against a railroad carrier, was an arrest warrant issued for

1  him at that time?

2  A    Yes.

3  Q    Okay.  And was he arrested on that charge?

4  A    Yes, he was.

5  Q    And I guess that arrest was in North Dakota; is that

6  correct?

7  A    It was.

8  Q    Okay.  So, he was in jail then for a period of a handful

9  of days?

10  A    Yes.  He was arrested on -- would have been September

11  11th, 2020, and released on September 14th, 2020.

12  Q    Okay.  And while he was in custody, did -- as part of your

13  investigation, did you obtain jail calls that he made?

14  A    Yes.

15  Q    And these are jail calls that he made to his mom and his

16  dad?

17  A    Yes.

18  Q    And I believe that there was a friend -- or in some of the

19  calls maybe there was a friend that was on the line?

20  A    Yes.  A friend identified as Tyler Salo (phonetic).

21  Q    And do you know whether or not in any of those calls that

22  he wanted his friend, Tyler Salo, to get in touch with the

23  juvenile?

24  A    Yes.  He asked Tyler if he could get a hold of the

25  juvenile involved in the incident to see if the juvenile was

Hellekson - Direct                    27

1  still on his side.

2  Q   And later, at some point in September of 2020, did an

3  individual named Josiah -- and I'm not sure if I know how to

4  say the last name -- Asbe (phonetic), maybe.

5  A   Yes.

6  Q   I'm not sure if I'm saying that correctly.  Did that

7  individual --

8  A   Yes, that's correct.  Josiah Asbe.

9  Q   Asbe.  Okay.  Did he contact investigators?

10 A   Yes, he did.

11 Q   And what did he tell them?

12 A   He originally contacted Burlington Northern Santa Fe's

13 ROCC, which is their call center, requesting to speak with

14 Burlington North Santa Fe police officer Kerri Gortmaker.

15 Q   Okay.  And what --

16 A   And he ended up speaking with Gortmaker, which would have

17 been on September 17th.  He made telephone contact with

18 Gortmaker, telling her that he saw a newsfeed involving Skylar

19 Goodman and a -- and the juvenile, and he had information that

20 law enforcement had every -- everything incorrect, and that

21 Skylar didn't place a derailer on the track.

22 Q   Okay.  Did he tell them who did at that point?

23 A   Yes.  He said that he was -- he had witnessed the

24 incident.  He was in the car when the juvenile placed the

25 derailer on the track.  He called it a derailer.  It's

1   actually a rerailer.  But, and that was later sorted out with

2   him.  But he basically said that Goodman stayed in the car and

3   the juvenile, while driving the car, threw the rerailer out

4   the window.

5   Q   Did Mr. Asbe meet with investigators and talk about what

6   happened on multiple occasions?

7   A   Yes.  We met first with Mr. Asbe on the next day, which

8   would have been September 18th.  We met with him and

9   interviewed him.

10  Q   Okay.  And when you say we, who was it that met with him

11  and interviewed him on the 18th?

12  A   Myself and Burlington Northern Santa Fe police officer

13  Kerri Gortmaker.

14  Q   Okay.  And did you confront him about the story -- and I

15  think you said he said it was a re -- derailer instead of a

16  rerailer?

17  A   Yes.

18  Q   Okay.  Did you confront him about his story and about

19  whether or not that would even be possible for somebody to do

20  what he said they did?

21  A   I did.  Yes.

22  Q   Okay.  And did he admit to officers that he was not

23  truthful about that?

24  A   He did.  He admitted that he wasn't truthful about the

25  rerailer being thrown out the window.

Hellekson - Direct                          29

1  Q   Okay.  And at the end of the day, can you tell us what he

2  told you about what happened?

3  A   By the end of the interview, Josiah Asbe indicated that he

4  was not there, he did not witness the incident, and that he

5  felt threatened by Skylar Goodman, who contacted him in order

6  to tell the -- the story that he had told us originally.  He

7  told us that Goodman contacted him, told him to tell the story

8  to the Burlington Northern Santa Fe police and to also contact

9  the media saying that Goodman was -- did not place the

10 rerailer on the track.  Essentially, by the end of the

11 interview, he had stated that he was not -- that he, Josiah

12 Asbe, did not witness the incident and that Goodman had

13 contacted him, telling him what to say.

14 Q   And was Mr. Asbe in the city or in that location even at

15 that time, or what did he tell you about that --

16 A   No.  He was --

17 Q   -- about where he was?

18 A   -- working in Iowa.

19 Q   Can you say that one more time?  Working where?

20         THE COURT:  Iowa.

21         MS. HARRIS:  Iowa.  Okay.

22         THE WITNESS:  He was working in the state of Iowa at

23 the time.

24         MS. HARRIS:  Okay.

25 BY MS. HARRIS:

Hellekson - Cross                                    30

1  Q   And did Mr. Asbe say that he was afraid of the defendant?

2  A   Yes, he did.

3         MS. HARRIS:   Your Honor, that's all the questions I

4  have.

5                      CROSS EXAMINATION

6  BY MS. FONTICIELLA:

7  Q   Agent Hellekson, this is Sonia Fonticiella.   I'm defense

8  counsel for Mr. -- Mr. Goodman.   Can you hear me okay?

9  A   Yes.   Yes, I can.

10  Q   Okay.   I first want to ask you about this jail phone call.

11  That -- that happened right after his arrest, correct -- his

12  initial arrest?

13  A   There were several calls made.   I believe a total of nine.

14  And --

15  Q   Well, I'm asking about the time frame.   Did they happen

16  before -- they happened before he was released on his bond

17  conditions, correct?

18  A   I'm not certain of that.   I believe so.   I believe you

19  might be correct.

20  Q   Okay.   Then Mr. -- I want to get to Mr. Josiah Asbe.   He

21  told you some pretty wild stories, didn't he?

22  A   He told me various stories.

23  Q   Okay.   And -- and a lot of those were untrue, correct?

24  A   Yes.

25  Q   In fact, he even admitted to lying to you several times?

1  A    Yes.

2  Q    Even about things that didn't -- didn't matter, correct?

3  A    Well, I would not say that's correct.  I would say it all

4  mattered.

5  Q    Okay.  Well -- well, so -- and I'll -- on page 4 of 7 of

6  one of these -- of one of these reports, it says he initially

7  stated that he and Goodman met at a Walmart in Fargo and

8  recorded a video there.  And then -- but then he -- but the

9  location was incorrect of some video that was allegedly

10  recorded, and then he -- he said he doesn't know why he lied

11  about it, other than that he was scared or an impulsive,

12  right?  So, that really -- the location of the video didn't

13  matter, but he's lying to you about all kinds of stuff is my

14  point, correct?

15  A    Yes.

16  Q    Okay.

17  A    I'm not -- I'm not -- you know, I'm trying to look for 4

18  of 7.  Yes, it says that he initially stated he and Goodman

19  met at Walmart.

20  Q    Yes.

21  A    He later, I believe, recanted that.

22  Q    Yeah.  Because you -- you had to confront him a few times

23  about different things that he was lying about, right?

24  A    Yes.  Another agent was interviewing him along with, you

25  know, Gortmaker -- agent and Gortmaker.

1  Q   Uh-huh.

2  A   But, yes, that is correct.

3  Q   Okay.  So, in your own words -- and I'm going to end at

4  this -- Mr. Asbe lied to you several times, it's written in

5  your -- in your reports that he was untruthful about several

6  different things, correct?

7  A   Yes, that's correct.  That's correct.

8  Q   Okay.

9          MS. FONTICIELLA:  Nothing further, Your Honor.

10         THE COURT:  Redirect?

11         MS. HARRIS:  No -- sorry -- no, Your Honor.

12         THE COURT:  Agent, the jail -- go back to the jail

13 calls.  Did you actually listen to the jail calls?

14         THE WITNESS:  I did not.

15         THE COURT:  Then what is -- tell me again what's your

16 knowledge about them?

17         THE WITNESS:  Following the initial interview of

18 Josiah Asbe, Burlington Northern Santa Fe police officer Kerri

19 Gortmaker requested the jail call recordings from the Cass

20 County jail.  She listened to the recordings and wrote a

21 report, which I've been recently given.  And then, so I never

22 listened to the actual jail calls myself.

23         THE COURT:  Well, what is -- what does the report

24 say?  I mean, you say recently.  Did you get the report today?

25         THE WITNESS:  No.  Actually, I got the report -- I

Hellekson - By the Court                                    33

1   don't have it in front of me to know.  Let's see.

2           THE COURT:  But, so, you got it some time before

3   today?

4           THE WITNESS:  No, I did get it before today.  I did

5   get a copy of the supplement before today, it was in draft

6   form.  I just got the final copy sent to me today.

7           THE COURT:  What's your understanding of what

8   happened on the jail calls based on your review of the report?

9           THE WITNESS:  Essentially, the calls made were to his

10  mother and father.  This is Skylar Goodman to his mother and

11  father.  At least one jail call, it appeared that his friend,

12  Tyler Salo, was present, because when Skylar asked -- when

13  Goodman asked either his mother or father to see if they can

14  make contact with the juvenile involved in this case, he was

15  advised by one of them that it was not a good idea and that he

16  needs to talk with Tyler.  Tyler then got on the phone and

17  said that he would make contact with the juvenile, because he

18  had -- and what Goodman was asking was to see if the juvenile

19  was still on his side.

20          THE COURT:  Did you know, was that contact ever made?

21          THE WITNESS:  There was a later phone call between --

22  between Goodman -- and I'm looking for the report right now.

23  Sorry.  Here we go.  There was a later phone call made between

24  -- where Goodman was speaking with Salo.  And forgive me a

25  moment, I need to look this up, if you don't mind.

1         THE COURT:  Sure.

2         THE WITNESS:  So, on September 12th, which would have

3   been one of the jail calls, at 1353 hours, Goodman asked his

4   father if he knew anyone high up in Burlington Northern Santa

5   Fe who could be contacted, if they would drop the charges

6   against Goodman.  During that conversation -- hold on, this is

7   a different one.  Sorry about that.  Okay.  So, on 9/13/2020,

8   at 1141 hours, Goodman asked -- was speaking with his mother,

9   he asked if they got a hold of the juvenile.  His mother told

10  him that would be a bad idea or it might be a bad idea.

11  Goodman's father said Goodman needed to call Tyler and talk to

12  him.  Tyler Salo entered the call, and Goodman asked him to

13  call the juvenile and, quote, "feel him out," unquote, to see

14  if the juvenile had heard anything about Goodman's arrest.

15  Goodman told Tyler Salo to tell the juvenile the situation

16  after he felt him out, and if it appeared that the juvenile

17  was still on Goodman's side, to reiterate that the juvenile --

18  that Goodman still needed him on his side.

19        THE COURT:  So, my question is, did he -- did that

20  conversation actually take place?

21        THE WITNESS:  Yes.

22        THE COURT:  Okay.  What's -- what's your knowledge of

23  that?  What happened?

24        THE WITNESS:  My knowledge comes from the report

25  written by Burlington Northern Santa Fe police officer --

Hellekson - By the Court                            35

1          THE COURT:  I understand.  Let me rephrase my

2    question.

3          THE WITNESS:  I'm sorry.

4          THE COURT:  No, that's all right.  I understand where

5    you're getting this information from.  So, what happens?

6          THE WITNESS:  I'm unaware if -- if that -- let's see

7    -- maybe I'll look at a subsequent phone call to see if we

8    have what happened (indiscernible).

9          THE COURT:  The question is, did Tyler -- do you

10   know, did Tyler talk to the juvenile?

11         THE WITNESS:  I'm looking for a subsequent phone

12   call, I think is here --

13         MS. FONTICIELLA:  Your Honor, may I object?

14         THE WITNESS:  -- which would explain the answer to

15   that.

16         THE COURT:  Hold on one second.  We have an

17   objection.

18         MS. FONTICIELLA:  I mean, I think we're kind of going

19   down a rabbit hole.  I don't know that there has been any

20   evidence that that conversation actually occurred.  I

21   certainly haven't been provided with any of the -- and that's

22   not Ms. Harris's fault, just for the record -- any information

23   about any jail phone calls or anything, so I would --

24         THE COURT:  Well, I'm -- I'm trying to figure out

25   what's going on, too.  I mean, I'm asking the question, and so

1    that's my -- my question is, so, according to the agent, there

2    was a request made to talk to this juvenile witness, so the

3    question is, did that happen?  And, I mean, I -- I don't know

4    what the objection is.  I mean --

5            THE WITNESS:  Well --

6            MS. FONTICIELLA:  Well, relevance, I guess, would be

7    the objection, and there is no facts in evidence.  And I --

8    this is really weird to object to a judge's question, Your

9    Honor, so I apologize.  But, I -- there's -- there's really no

10   -- I think it's getting outside the scope of what's already in

11   evidence.

12           THE COURT:  He -- I mean, he testified to it earlier,

13   but then he didn't really go into any of it, so I'm curious,

14   I'm -- I'm just --

15           MS. FONTICIELLA:  Yeah.

16           THE COURT:  -- I'm trying to figure out what

17   happened.  So, I mean, I think it's -- I think there are facts

18   in evidence, they just haven't been -- they haven't been

19   revealed yet.  I mean --

20           MS. FONTICIELLA:  Well, I mean, I know I'm going to

21   get overruled, Judge, but --

22           THE COURT:  I understand.

23           MS. FONTICIELLA:  -- I'd say that if they haven't

24   been revealed yet, I don't know that they exist, is my --

25   outside -- outside of what -- the knowledge of what the agent

Hellekson - By the Court                                    37

1  knows about what's inside those jail phone calls, I don't

2  think that there's anything else outside of that is my point.

3  And I'll leave it at that, Your Honor.

4              THE COURT:  Okay.  I'm going to overrule the

5  objection.

6              And I just want to know, did -- did the phone call

7  take place or did the contact take place?  Because the agent

8  testified now -- I mean, he testified to it on direct, but he

9  didn't really go into it, at least I thought he --

10             MS. FONTICIELLA:  Well, in my --

11             THE COURT:  -- he made some reference to it.

12             MS. FONTICIELLA:  Okay.  And I might be getting

13 confused.  My understanding is that he testified that there

14 was a jail phone call where he asked for that, not that it

15 went any further than that.

16             THE COURT:  Well, he didn't say.  Like I say, he said

17 there was this -- there was a request made -- what I heard him

18 say, "Tyler, hey," mom says, "Bad idea."  He then says, "But

19 I'll -- let me talk to Tyler."  Gets in touch with Tyler.  At

20 least, correct me if I'm wrong, that's what I'm hearing.  It's

21 kind of hard to follow this.  He then says, "I'll talk to" --

22 he says to Tyler, "Tyler, go contact the juvenile."  So, my

23 question is -- and we just left it at that.  I'm like, well,

24 do we know, did he contact the juvenile?  I think that's a

25 fair question.

Hellekson - By the Court                                38

1        And, Agent Hellekson, do you know, did he contact the

2   juvenile?

3        THE WITNESS:  There's a phone call on September 13th,

4   where Skylar is again talking to Tyler at 2022 hours, where

5   Tyler said -- or answers and said that he spoke with the

6   juvenile who told -- told Tyler that he had Goodman's back.

7   Tyler was unsure if he trusted the juvenile, because the

8   juvenile's statements were all over the place, but Tyler told

9   Goodman that the best that they could do was to believe the

10  juvenile for now when he said that he had Goodman's back.

11       So, that's what I have for now as far as showing that

12  the telephone call could have taken place between Tyler Salo

13  and the juvenile.

14       THE COURT:  Okay.  And then, that was while he was

15  still in custody, he hadn't been released yet, because he was

16  released on September 14th?

17       THE WITNESS:  That is correct.

18       THE COURT:  But my guess is, do you know -- were you

19  at the detention hearing?

20       THE WITNESS:  I was not.

21       THE COURT:  Okay.  Do you know about what's the time

22  frame of when he -- he then talks to this other guy, Asberry

23  (sic)?  Is that the right pronunciation?

24       MS. HARRIS:  Asbe.

25       MS. FONTICIELLA:  Asbe.

Hellekson - By the Court                                    39

1        THE WITNESS:  Yes, we do have -- we do have a time

2   frame on that, and that's according to Asbe himself.

3        THE COURT:  When is it that he -- when is the first

4   contact made with Asbe?

5        THE WITNESS:  So, the first contact following his --

6   Goodman's release, the first contact with Asbe -- with Asbe

7   was a text, where -- I believe it was over Snapchat.  Stand

8   by.

9        THE COURT:  What is his involvement in the case, may

10  I ask?  Is he the case agent?

11       MS. HARRIS:  (No audible response.)

12       THE WITNESS:  He contacted Asbe via Snapchat on 9/14

13  and set up a meeting for 9/15, so September 15th.

14       THE COURT:  So, on the date he was released on bond,

15  he contacted Asbe?

16       THE WITNESS:  Yes.

17       THE COURT:  And you have a Snapchat?  Because that

18  was my other question, was going to be -- because I think the

19  defense called into question the reliability of Asbe.  You

20  have a Snapchat that says "Meet with me"?

21       THE WITNESS:  We are attempting to get a hold of that

22  through legal procedure right now.  We do not have a copy of

23  that.

24       THE COURT:  Well, I mean, you just testified to it.

25  Where -- are you the case agent?

                    Hellekson - By the Court                    40

1          THE WITNESS:  Yes, I am.

2          THE COURT:  Okay.  So, Agent Hellekson, then how do

3   you know about the Snapchat?

4          THE WITNESS:  This is what was relayed to us by Asbe,

5   by Josiah Asbe during his second interview.

6          THE COURT:  Do you have any corroboration about

7   anything that Asbe told you?

8          THE WITNESS:  Regarding this contact?  Not at this

9   time.

10         THE COURT:  Any contact?

11         THE WITNESS:  We have -- no, not at this time.  We

12  don't have any -- we're still in legal proceeding.

13         THE COURT:  You went --

14         THE WITNESS:  We don't have any direct evidence.

15         THE COURT:  So what was your evidence that you

16  presented to the Grand Jury; your testimony?

17         THE WITNESS:  It was my testimony, being the two

18  interviews with Josiah Asbe, and Asbe's testimony.

19         THE COURT:  So he testified to the Grand Jury?

20         THE WITNESS:  Yes.

21         THE COURT:  Any questions based on my questions?

22         MS. FONTICIELLA:  I have -- I have a question, Your

23  Honor.

24         THE COURT:  You may.

25         MS. FONTICIELLA:  I'm sorry.

                        FURTHER CROSS EXAMINATION

1

2  BY MS. FONTICIELLA:

3  Q    In your -- in the report that you wrote, you actually sat

4  down with Asbe in one of your interviews with him and looked

5  at his Snapchat, correct?

6  A    That would be -- yes, another agent did that, Agent Sarah

7  Fason (phonetic).

8  Q    Okay.  And then, and that agent said that he checked his

9  messages --

10 A    Let me -- I'll pull it out real quickly.

11 Q    I'm on page 4 of 7 again.  The agents could not find any

12 of the accounts that he said threatened him --

13 A    Yes.

14 Q    -- when they were looking at it in their presence.  So,

15 you looked at the -- somebody looked at the phone and didn't

16 see anything, right?

17 A    Yes.

18 Q    Was that presented at the Grand Jury?

19 A    I wasn't privy to that, about whether or not he testified

20 to it, and I did not testify to that in the Grand Jury.

21 Q    Okay.  So you withheld that you didn't -- that somebody

22 looked at the phone and didn't see anything, at the Grand

23 Jury, when he was being indicted for this?

24          MS. HARRIS:  Your Honor, I'm --

25          THE WITNESS:  I was not asked the question, and it

42

1    didn't come up in the Grand Jury.

2           MS. FONTICIELLA:  Okay.

3           THE COURT:  Any other questions of this witness?

4           MS. FONTICIELLA:  Not from the defense, Your Honor.

5           MS. HARRIS:  No, Your Honor.

6           THE COURT:  All right.  Agent, thank you.  You're

7    free to go about your day.  Thank you.

8           THE WITNESS:  All right.  Thank you.

9        (Witness excused.)

10          THE COURT:  Do you have other evidence you wish to

11   present?

12          MS. HARRIS:  No, Your Honor.

13          THE COURT:  Okay.  Government rests.

14          MS. HARRIS:  Yes.

15          THE COURT:  Do you wish to present evidence?

16          MS. FONTICIELLA:  Your Honor, I have his mother here.

17   Shirley Goodman.  And she should not take very long at all.

18          THE COURT:  You may present her.

19          MS. FONTICIELLA:  Ms. Goodman, come forward.

20       (SHIRLEY GOODMAN, DEFENDANT'S WITNESS, SWORN.)

21          THE COURT:  You're going to have a seat where the

22   officer previously was seated, and same, you can take your

23   mask on or off or however you want to do it.

24          MS. GOODMAN:  Please.  Thank you.

25          THE COURT:  You may proceed.

S. Goodman - Direct                                    43

1          MS. FONTICIELLA:  May I stay seated, Your Honor?

2          THE COURT:  You may.  How ever you want to proceed.

3          MS. FONTICIELLA:  Okay.

4                          DIRECT EXAMINATION

5    BY MS. FONTICIELLA:

6    Q    Can you please state your name for the record?

7    A    Shirley Lee Goodman.

8    Q    And where do you reside?

9    A    At 1309 Quail Ridge Drive, Alexander, Arkansas.

10   Q    And are you Mr. Goodman's mother?

11   A    Yes.

12   Q    And he lives with you, right?

13   A    Yes.

14   Q    And he's lived with you since -- since he came back to

15   Arkansas?

16   A    He was living with me in North Dakota, and, yes, and then

17   he was able to come here a couple of weeks before I was able

18   to come, yes.

19   Q    Okay.  And how old is he?

20   A    19.

21   Q    When is his birth date?

22   A    June 2nd.

23   Q    Okay.  So he just turned 19?

24   A    Yes.

25   Q    Okay.  And are -- are you aware of any job opportunities

1  that he has here in Arkansas?

2  A   Yes.  He did try to go with Tyler -- Tyler was living with

3  us.  He is no longer living with us.  He's back in the state

4  of North Dakota.  Tyler was living with us and him and Skylar

5  was able to go out on this one job, this one morning, and he

6  -- Skylar called me, he was like -- I -- I had went somewhere,

7  and I don't remember, I'm sure Skylar knows, but I wasn't at

8  home that moment.  And he's like --

9  Q   Well, I'm not talking about jobs in North Dakota.  I'm

10 talking about any job opportunities --

11 A   No, this is here.

12 Q   Okay.  Got you.

13 A   Yeah.  In Arkansas.  And that's what I was going to say is

14 it was raining really, really hard that day.  And he started

15 calling, complaining, "Mom, I've got my work boots and the

16 shoelaces broke.  The shoelaces broke.  I need shoelaces."

17 So, I actually Venmoed him some money that day, and it says

18 "shoelaces" on it.  And I said, "Go get shoelaces and get to

19 this job."  And then, on my phone, I also texted him later and

20 I asked, I said, "Did you guys make it to this job?"  They had

21 went over there, and I guess the guy sent them to another

22 place to -- to work.  When he went over there, I -- I know the

23 boots came home all muddy and all of this, but I think he had

24 Skylar shoveling or something, but then they was making racist

25 comments to the boys and doing some other things, and Skylar

S. Goodman - Direct                                    45

1   and Tyler said they felt very, very uncomfortable.  They

2   didn't feel like it was a good idea to stay there, so they

3   came back to the house.

4   Q    So, he's trying to find another job now?

5   A    Yeah.

6   Q    Okay.

7   A    And so, then, this last week, Monday of this week, he went

8   and did a physical for a job, for a crane place or something

9   --

10  Q    Okay.

11  A    -- construction.

12  Q    Something in the construction business?

13  A    Yes.  Something.  So he did try again.

14  Q    Okay.  That's -- that's fine.  I just want to make sure

15  the Court knows he's actively --

16  A    Yes, ma'am, he is, he's been trying.

17  Q    -- seeking employment.

18  A    And like I said, they have scheduled him for like so many

19  drug tests that he -- there for a while he was doing them like

20  every other day.

21  Q    Uh-huh.

22  A    And, so, it's hard to kind of coincide with that.  And --

23  Q    Sure.

24  A    -- but he has been trying.

25  Q    Okay.  And you've never known him to be a violent person,

1  correct?

2  A   No, not towards me.  I mean, he's a kid.  And, I mean,

3  teenagers, they do get angry and upset, at mom especially.

4  And, but, nothing that I felt in fear of my life for, no.

5  Q   Okay.  And you would make sure that he comes to court?

6  A   Oh, I have -- even on the other case that they mentioned,

7  I call, I have talked, I have texted Mr. Geiggar on things,

8  too, to check on things.  I -- and his other lady that he had

9  in North Dakota, I was -- had called her numerous times.

10  Constantly in contact with somebody to let them know where he

11  is or what he's doing.  And I let him know, "I'm not covering

12  for you."  I mean, so.

13  Q   Okay.  But you'll --

14  A   Yes.

15  Q   -- you know, he's 19 years old, so you're helping him make

16  sure that he's --

17  A   Yes.

18  Q   -- where he's supposed to be?

19  A   I sure do.

20  Q   Will you make sure he gets to North Dakota to court?

21  A   We've been planning on that already.  Yes.

22  Q   Okay.

23  A   He's got the other court date.  And, yes, we've already

24  been in contact with them, trying to make sure that he's

25  there, and when we have to do whatever we have to do.  Yes.  I

1   haven't taken work again.  I was actually a manager, and I

2   haven't taken work at this time so that I can deal with him.

3   Q    Okay.

4   A    So.

5   Q    And I don't have anything further.

6   A    Okay.

7                       CROSS EXAMINATION

8   BY MS. HARRIS:

9   Q    And, ma'am, are you aware of the charge that he picked up

10  in June of 2020 for a fight with his then girlfriend or

11  ex-girlfriend?

12  A    Am I aware of the case?

13  Q    Uh-huh.

14  A    Yes.

15  Q    What is the status of the case?

16  A    We've been told numerous different things.  We were told

17  and -- that it was a possible misdemeanor or going to get

18  reduced to that is what his attorney -- I haven't talked to

19  him, that's what Mark had, I guess, revealed to Skylar, that

20  it could be dropped to a misdemeanor or dropped completely.

21  So, Mr. Lancaster, actually, the day he was getting out of

22  jail, showed up in the courtroom to represent him, because

23  Chad Pennington couldn't make it that day, and he spoke to the

24  judge that day in the courtroom and said they expected it to

25  be a misdemeanor or dropped completely.  And then, at a later

1  date, last week, Skylar talked to his attorney, Mark Frieze

2  (phonetic), and said that we do need to go ahead and go to

3  trial, I believe it's trial, on November 17th, and that he

4  wanted Skylar to be there a little bit early so that he could

5  go over the case with him.  I guess they've brought in some

6  new witnesses.  So, that's all I know on that.

7  Q   Okay.  Because we have a date of October 7th, 2020.

8  A   Okay.

9  Q   Did he go to court that date?

10  A   On when?

11  Q   I'm sorry.

12  A   No, he didn't -- the one court date, he did not have to

13  go.

14  Q   Okay.

15  A   We called -- we called in advance and they told him he did

16  not have to be there.  I guess Mark represented him or

17  something.  And we did talk to the bond lady, so he did not

18  have to be at one of the court hearings.

19  Q   Okay.

20  A   So.

21  Q   It just says on here October 7th, 2020.

22  A   Yeah.  He didn't have to go.

23  Q   Okay.

24  A   They've been like reducing this and reducing it down to

25  where they haven't needed him to be present at all, so.

1   Q    And you heard -- you were in the courtroom when the agent

2   was testifying?

3   A    When?

4   Q    Just a few moment -- just a little bit ago, the agent was

5   on the phone?

6   A    I don't remember him.  They didn't go over -- this is the

7   most I've heard of this case.

8   Q    No.  No.  I'm just saying, have you been in the courtroom

9   --

10  A    Today?  Yes.

11  Q    -- throughout this hearing today?

12  A    Yes.  Yes.

13  Q    Okay.  And you heard the agent talk about jail calls?

14  A    Yes.

15  Q    Calls -- did you speak with your son while he was in jail?

16  A    Yes, I did.

17  Q    Okay.  And did you all discuss having his friend, and I

18  believe you said this was the friend that was living with him,

19  Tyler Salor (sic)?

20  A    Salo wasn't living with us at that time.  He was there

21  visiting --

22  Q    Okay.

23  A    -- off and on, on different days.  It was -- they lived

24  across the street from us in some apartments.

25  Q    Did you hear the discussion about having Salor (sic)

S. Goodman - Cross                                          50

1   contact the juvenile?

2   A    No, I didn't.

3   Q    You did not hear that?

4   A    No, I didn't.

5   Q    Did you know anything about it prior to the agent talking

6   about it?

7   A    What Skylar -- if you're asking if Tyler said something,

8   no, I didn't hear their conversation.  Skylar asked me -- or

9   said something about getting -- he needed to talk to Dion or

10  something, and I said, "That's probably not a good idea,

11  Skylar, you don't need to be doing anything to do with this

12  case."  So.

13  Q    Okay.

14  A    But as far as when him and Tyler talked, I don't know what

15  was said.

16  Q    Okay.  But Tyler talked to you about it?

17  A    Tyler did?

18  Q    That's what I'm asking.  I thought that's what you just

19  said?

20  A    No.  Skylar.

21  Q    Skylar?

22  A    Yeah.

23  Q    I'm sorry.

24  A    And that's what the agent was saying, was on the phone he

25  overheard Skylar saying he needed to get in contact with him

S. Goodman - By the Court                          51

1   -- with the juvenile, and I said that it wasn't a good idea.

2            MS. HARRIS:  Okay.  Your Honor, that's all the

3   questions I have.

4            THE COURT:  Redirect?

5            MS. FONTICIELLA:  That's all I have, Your Honor.

6            THE COURT:  Did you attend the detention hearing they

7   had in North Dakota?

8            THE WITNESS:  Yes, sir.

9            THE COURT:  And did the judge there, Judge Senechal,

10   did she hear the testimony of the charge with the ex-

11   girlfriend or the girlfriend?

12            THE WITNESS:  That's the one that Mr. Lancaster spoke

13   about, that he said that he expected it -- that he had been on

14   the phone that day with Mark Frieze, the other attorney, and

15   that it was expected to be dropped down to a misdemeanor if

16   not dropped completely.

17            THE COURT:  But, I mean, that was considered when the

18   judge --

19            THE WITNESS:  Yes.

20            THE COURT:  -- released him?

21            THE WITNESS:  Yes, it was.

22            THE COURT:  All right.  And, but, none of the jail

23   conversation or anything came up at that hearing, did it?

24            THE WITNESS:  No.

25            THE COURT:  And --

S. Goodman - By the Court                         52

1     THE WITNESS:  No, they didn't speak about any -- like

2   I've heard more today that I've heard altogether.

3     THE COURT:  And were you ordered -- I can't remember,

4   were you ordered to be what's called a third party custodian

5   for your son?

6     THE WITNESS:  What is that?

7     THE COURT:  Okay.  Apparently, you weren't.

8     THE WITNESS:  No.  I was just told that he had to

9   reside with either me or dad.  And, so, I waited back in North

10  Dakota and kept my job in case they wasn't going to release

11  him, because they had -- they said it's like a privilege, I

12  guess, for him to get accepted here in Arkansas.  So, they

13  said it's not a guarantee that he can come to Arkansas.  So, I

14  stayed in North Dakota until he was able to be accepted.  And

15  then I was able to go ahead and move.  So, I was going to stay

16  in one place or the other, to where he had a place to stay.

17    THE COURT:  What was -- what brought you all to

18  Arkansas?

19    THE WITNESS:  My husband's job.

20    THE COURT:  Which is?

21    THE WITNESS:  He actually lost his job over the whole

22  mess with the train, and everything going on, that he lost his

23  position.  And he was there almost 20 years.  And they didn't

24  say it was for that, they said it was for something else.  And

25  he actually lost his job, but he received another job offer --

S. Goodman - By the Court                          53

1    opportunity to come here.  Well, this was closer to family and

2    friends in this area.  We know nobody other than who we met in

3    North Dakota.

4            THE COURT:  What's the job here?

5            THE WITNESS:  My husband?

6            THE COURT:  Yes.

7            THE WITNESS:  He's actually a regional manager.  It's

8    for BNP Enterprises.  They do derailments or whatever as well,

9    but --

10           THE COURT:  It's the rail -- rail industry.  Okay.

11           THE WITNESS:  But not only that, it's also

12   construction and some other things.  And he's been actually in

13   Louisiana since I've been here, so I haven't seen him.  So.

14           THE COURT:  Okay.  He has a court hearing in like

15   less than two weeks?

16           THE WITNESS:  Yes.

17           THE COURT:  And that's the trial?

18           THE WITNESS:  That's the trial, yes.  They have told

19   us that he has to be there on the 17th.  But Mark Frieze has

20   asked for us to show up a little bit early so he has a chance

21   to go over everything with him and what's going on.

22           THE COURT:  All right.

23           THE WITNESS:  So, I had made plans of leaving, not on

24   Friday, the 13th, I'm hoping to leave a couple of days prior

25   to that.

                    S. Goodman - By the Court                    54

1            THE COURT:  You're planning on taking him back to

2   North Dakota for trial?

3            THE WITNESS:  Yes.

4            THE COURT:  Okay.

5            THE WITNESS:  That's why I said I haven't started

6   work or anything, so.

7            THE COURT:  Any questions based on my questions?

8            MS. FONTICIELLA:  No, Your Honor.

9            MS. HARRIS:  No, Your Honor.

10           THE COURT:  All right.  Thank you, ma'am.  You may

11  stand down.

12           THE WITNESS:  Thank you.

13      (Witness steps down.)

14           THE COURT:  Any other evidence you wish to present?

15           MS. FONTICIELLA:  No, Your Honor.  Just argument.

16           THE COURT:  Defense rests.

17           Any rebuttal?

18           MS. HARRIS:  No, Your Honor.

19           THE COURT:  Do you wish to make argument?

20           MS. HARRIS:  If the Court wants to hear argument.

21           THE COURT:  I mean, here is where I am with it, Ms.

22  Harris.

23           MS. HARRIS:  Okay.

24           THE COURT:  I don't -- you know, there's serious --

25  there's a serious allegation in the indictment, and I don't

1 know what the Grand Jury heard, but the testimony here from

2 the agent was not very good.  And, like I say, I don't know

3 whether it's just the fact that he's not here, or there.  But

4 it seemed like he didn't really have much information, other

5 than this individual, Asbe, which I think the defense has

6 called into question the veracity of Mr. Asbe.

7 　　　　　He obviously has to get back to go to trial, you

8 know, in short order.  I'm inclined -- well, I would be

9 inclined to detain him based on trying to derail a train, but

10 the judge had already released him on that, and the judge had

11 heard this other information, Judge Senechal, and bonded him

12 out.

13 　　　　　So, really, what we're here today for, in my opinion,

14 is the tampering with a witness, which, to me, seems pretty

15 weak.

16 　　　　　He's got bigger problems than that, with -- he's got

17 an impending trial that, on this thing, if it's a felony, it

18 says a minimum two year mandatory minimum time in the -- in

19 the North Dakota state.  That's what the charge says, the

20 information says, "mandatory minimum two years."

21 　　　　　So, like I say, if he's convicted of it, I'm pretty

22 sure -- let me look at it.

23 　　　　　MS. HARRIS:  And is Your Honor saying that the trial

24 in the --

25 　　　　　THE COURT:  State trial.

1          MS. HARRIS:  The state trial.  Okay.

2          THE COURT:  Yeah.  See, so, I'm looking here at this

3    information.  I don't know whether you gave that to me or

4    whether that was in my file.  But, this June 27th, 2020 Class

5    C felony, it says, "minimum mandatory two years

6    incarceration."

7          So, like I say, he's got -- he's got serious

8    impending issues that he needs to get resolved here in the

9    next couple of weeks.

10         So, here is what I'm inclined to do, is let him go

11   back to North Dakota on his own.  He's going to be up there

12   here in short order.  And let Judge Senechal determine whether

13   he's violated her order and let her hear -- I mean, I think

14   probably the -- it sounds like the railroad police have more

15   information than the FBI.  So, probably let the -- let the

16   judge up there deal with it on whether or not he tampered with

17   the witnesses or not.  Right now, it's not looking so good.

18         MS. HARRIS:  Well, and, Your Honor, I will say, and I

19   probably should have asked the agent this initially, he is

20   home and has been home under quarantine, so.

21         THE COURT:  Even more reason he should have been

22   prepared.

23         MS. HARRIS:  I know.  So --

24         THE COURT:  Like I say, I don't mean to be

25   disrespectful to him.

1          MS. HARRIS:  No, I understand.

2          THE COURT:  But I just -- the issue is I can't really

3     make much out of the testimony of the agent.  The agent's

4     testimony was not good and not very persuasive, that, you

5     know, I don't know what's going on.  And that's -- that's the

6     problem, is I think Judge Senechal needs to resolve that.

7          So, I'm going to release him on her order.  I'm not

8     going to do anything else.  He's got to get back up there for

9     trial.

10          But I will -- I will tell, Mr. Goodman, you -- your

11    mom gave you some great advice when -- when you initially

12    said, hey, I need to get a hold of anybody associated with the

13    case, and that was -- that's a bad idea.  And I'm just going

14    to tell you that, you know, you've -- you've got some serious

15    issues here that you've got to get resolved, but you need to

16    tighten your game up big time.  And Officer Geiggar is an

17    excellent Pretrial Officer, and if there's any sort of issues

18    with you, we're going to revoke you and we're going to get you

19    back in here in custody, and then you can go by U.S. Marshals.

20          But, right now, I mean, if I detain him, you know,

21    he's screwed on that trial date, because he'll never make it

22    up there.  So, you know, that's literally like, what is it,

23    two weeks away -- less than two weeks away.  So, and it's ten

24    days away -- or, no, nine days away.  So, he can take care of

25    that matter, and then he can go before Judge Senechal and she

1  can determine whether or not she wants to revoke him, and she

2  can probably hear much better testimony from the -- from the

3  actual witnesses, versus me hearing it.

4          So, can we get him released today from --

5          THE COURTROOM DEPUTY:  I just sent a e-mail to the

6  Marshals Office.

7          THE COURT:  I'm going to release you on your order

8  from Judge Senechal in the case.  And don't -- you -- you're

9  on thin ice.  You've just been indicted on a second charge.

10  No shenanigans.  You need to buckle down.  You need to be at

11  home.  Really doesn't need to be looking for work.  You need

12  to be at home, getting ready for your mom to drive you back up

13  to North Dakota so you can get this other case resolved, and

14  then get before Judge Senechal.  And we'll tell her what's

15  going on and she can figure out when she wants to see you in

16  relation to this other trial.

17          It's not a very good record that I just made, but is

18  that --

19          MS. FONTICIELLA:  I think it's perfect.

20          THE COURT:  -- is that fair enough guidance?  All

21  right.  And, like I say, I'm not trying to be mean to the

22  agent or whatever, but it's just, you know, in a -- in a

23  detention matter, he wasn't persuasive to make me think that I

24  should detain him.

25          MS. HARRIS:  I understand, Your Honor.

1    THE COURT:  All right.  Anything else we need to take

2 up in this case?  For the defense?

3    MS. FONTICIELLA:  No, Your Honor.

4    THE COURT:  For the United States?

5    MS. HARRIS:  No, Your Honor.

6    THE COURT:  All right.  You all remain at ease.

7 Thank you all very much.  I know I kept you late here.

8    MS. FONTICIELLA:  Thank you.

9    THE COURT:  And good luck to you, Mr. Goodman and Ms.

10 Goodman.

11    (Adjournment at 5:43 p.m.)

12    ELECTRONIC SOUND RECORDING CERTIFICATION:

13 I, court approved transcriber, certify that the foregoing is a

14 correct transcript from the official electronic sound

15 recording of the proceedings in the above-entitled matter.

16

17 /s/Robin Warbritton                 December 5, 2020
   Signature of Approved Transcriber   Date

18

19 Robin Warbritton
   Typed or Printed Name

20

21

22

23

24

25